# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 12-128 (MJD/JJK) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Felecia Thomas, | |
| Defendant. | |

John E. Kokkinen, Esq., and Lola Velazquez-Aguilu, Esq., United States Attorney's Office, counsel for Plaintiff.

James S. Becker, Esq., Office of the Federal Defender, counsel for Defendant.

---

This matter is before the Court for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1 on Defendant's Pretrial Motion to Suppress Statements (Doc. No. 17). The Court held a hearing on the motion on November 29, 2012, at which Lieutenant James Dern, a United States Bureau of Prisons correctional officer, testified for the Government. As discussed below, based on the motion, the testimony at the hearing, and on the parties' post-hearing submissions, the Court recommends that the motion be granted and that Defendant's June 10, 2011 statement be suppressed.

Defendant is charged in the Indictment with one count of assault with a dangerous weapon, with intent to do bodily harm, as a result of a June 10, 2011 incident. (Doc. No. 1.) At the time of the incident, Defendant was serving a

sentence for a different charge[1] at the United States Bureau of Prisons Federal Correctional Institution in Waseca, Minnesota ("FCI-Waseca"). On June 10, 2011, she is accused of having used a piece of cord from a laundry bag to strangle another inmate. (*Id.*) In the motion before this Court, she seeks to suppress statements she made to a FCI-Waseca prison official shortly after the alleged assault. (*See* Doc. No. 43, Tr. of Mot. Hr'g ("Tr.") 27:8–13; Def.'s Hr'g Ex. 1 (indicating that the full statement Defendant made was: "I choked her. I'm tired of the nitpicking. I choked her[,]" and indicating that Defendant was asked by the prison official "what the was rope for, to which she stated, 'to choke her'"); Def.'s Hr'g Ex. 3 (same).)

## FACTS

At around 4:15 p.m.[2] on the afternoon of June 10, 2011, Operations Lieutenant James Dern, a Bureau of Prisons official employed at the FCI-Waseca prison, received a report that there was a "medical emergency" in the prison's "C-Unit." (Tr. 8:15–9:4.) Lieutenant Dern testified that because these types of distress calls for staff assistance often involve inmates suffering from seizures, he originally assumed he was responding to an incident of that variety. (Tr. 9:1–2.) When he approached the C-Unit, he ascended a flight of stairs into a

---

[1]     Defendant was serving a 207-month sentence for arson. (Doc. No. 8, Order for Detention, Findings and Conclusions 2, at ¶ 3.)

[2]     Lieutenant Dern explained that the incident happened during the afternoon "count," when the prison administrators count the number of inmates. (*See* Tr. 8:8–9; 32:25–33:3.)

common area.  (Tr. 11:6–11.)  When he reached the top of stairs, he saw

between thirty and fifty inmates in a half-moon configuration to his left.

(Tr. 11:12–16.)  He explained that none of these inmates were talking as he

entered the C-Unit, and the other staff that responded to the scene began

sending these inmates back to their rooms and removing them from the

immediate area.  (Tr. 13:19–25.)  Standing across from these inmates, he saw

Defendant standing with a piece of cord wrapped around her hands, held in front

of her in a defensive position.  (Tr. 12:1–18.)  Another officer who had responded

to the call for assistance pulled the cord out of Defendant's hands and Lieutenant

Dern handcuffed her.  (Tr. 13:10–18.)  According to Lieutenant Dern, it is

standard procedure at FCI-Waseca to restrain any inmate who has been involved

in a fight or an assault.  (Tr. 14:8–15.)  Lieutenant Dern stated that he knew, at

this time, Defendant "was a participant in some kind of altercation."  (Tr. 14:4–7.)

After Defendant was handcuffed, another officer or staff member then

removed her from the immediate vicinity, possibly placing her into a foyer just

outside the entrance to the C-Unit.[3]  (Tr. 31:15–19.)  Lieutenant Dern then saw

that another inmate in the area had "an injury" around her neck, and that inmate

was promptly handcuffed as well.  (Tr. 14:18–15:7; *see also* Def.'s Hr'g Ex. 3

(describing the injury to the neck of the other inmate).)  Another officer or staff

---

[3]     Lieutenant Dern could not recall with certainty whether he had removed
Defendant from the area and into the foyer or whether another officer had done
this.  (Tr. 44:20–45:13.)

member at the scene then escorted the injured inmate to FCI-Waseca's infirmary for medical treatment.  (Tr. 15:1–7.)

Lieutenant Dern then left the C-Unit and escorted Defendant to the Special Housing Unit ("SHU").  (Tr. 15:19–21.)  The SHU is an area within the prison where inmates are housed in segregation from the general population for administrative or disciplinary reasons.  (Tr. 16:16–21.)  Lieutenant Dern explained that an inmate who has been involved in a physical altercation is transferred to the SHU as part of FCI-Waseca's standard procedures.  (Tr.16:22–17:1.)  Inmates are placed in Disciplinary Segregation when they are found guilty of a prohibited act and they are "serving a sentence, basically."  (Tr. 17:25–18:2.)  As Lieutenant Dern escorted Defendant from the C-Unit to the SHU, she remained handcuffed.  He explained that he also held Defendant by the arm throughout the walk to the SHU because an inmate that has been restrained following a physical altercation is not free to simply wander around the facility.  (*See* Tr. 22:1–5.)

The walk between the C-Unit and the SHU is between fifty and one hundred yards.  (Tr. 16:13–15.)  While Lieutenant Dern was escorting Defendant to the SHU, he asked her "Hey, what happened? What's going on?"[4]  (Tr. 21:17–

---

[4]     Defense counsel cross-examined Lieutenant Dern about whether Dern was, in fact, the person that escorted Defendant to the SHU based on the wording in a report Dern wrote after the incident.  (*See* Tr. 29:20–23 (suggesting that Dern was "not the person that escorted [Defendant] to the Special Housing Unit").)  Lieutenant Dern later clarified that he was the one that escorted

20.)  Defendant did not immediately respond to Dern's questions.  (Tr. 19:20–25.)

When Lieutenant Dern asked Defendant these questions, he did not raise his

voice, he did not make any hand gestures, he did not make any threats, he did

not make any promises about what would happen if she answered his questions,

and he did not confront her with any evidence.  (Tr. 21:24–22:22.)  Then, after

they arrived at the SHU, but before Lieutenant Dern placed Defendant in a

holding cell there, Defendant responded to Lieutenant Dern's questions as

follows: "'I choked her.  I'm tired of the nitpicking.  I choked her.'"  (Tr. 29:13–17

(quoting Def.'s Hr'g Ex. 1); *see also id.* at 19:20–25, 33:13–34:9 (describing that

the questions were asked before Defendant was placed in a holding cell); *see

also* Def.'s Hr'g Ex. 1 (indicating that Defendant made the incriminating

statement after she had been escorted to the SHU).)  Lieutenant Dern then

asked Defendant "what the rope was for," to which Defendant responded, "'[T]o

choke her.'"  (Tr. at 29:15–17 (quoting Def.'s Hr'g Ex. 1).)  When she made these

statements, at least two other officers in the SHU were standing behind

Lieutenant Dern assisting him in putting Defendant into the holding cell.

(Tr. 26:7–18.)

Lieutenant Dern testified that he asked Defendant these questions not to

have "conversation or an interview," but as "a last-ditch to find out what

(Footnote Continued from Previous Page)
Defendant to the SHU and that the statements she made to him came at the
conclusion of that escort.  (Tr. 33:4–16.)  He also explained that he did not go
back to the SHU to talk with Defendant at a later time.  (Tr. 33:17–19.)

happened, what's going on." (Tr. 25:4–12.) He testified that when he asked the questions, he intended to address possible issues with the rest of the inmate population such as finding out if anyone else had been injured, if the incident was gang-related, and if there was likely to be any retaliation as a result of the suspected assault. (*See* Tr. 20:4–21:16.) Lieutenant Dern acknowledged, however, that by restraining Defendant and taking her out of the C-Unit to the SHU he had accomplished the goal of separating the two individuals he believed had been involved in the incident from each other and the general population. (Tr. 36:19–37:7.)

## DISCUSSION

### I. Applicable Law

Defendant contends that her June 10, 2011 statement cannot be admitted against her because it was taken in violation of her Fifth Amendment right not to be compelled to be a witness against herself in a criminal case. In particular, she argues that her statements cannot be admitted against her on grounds that she was not provided the warnings of her rights required by *Miranda v. Arizona*, 384 U.S. 436 (1966). It is undisputed that Lieutenant Dern did not provide Defendant with any *Miranda* warnings before asking Defendant any questions or before she made the statements she seeks to suppress. Thus, the issue here is whether *Miranda* warnings were required at all.

## A.    Custody

Government agents must provide a *Miranda* warning prior to a custodial interrogation. A custodial interrogation is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Although not an exhaustive list, in determining whether a defendant was in custody at the time of questioning, this Court considers such factors as:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see also United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004) (indicating that the *Griffin* factors serve as a guide in resolving the question "whether the defendant was restrained as though he were under formal arrest").

When a person is already independently imprisoned at the time she is questioned, she is not necessarily "in custody" for purposes of *Miranda*. *Howes v. Fields*, 132 S. Ct. 1181, 1191–92 (2012) ("Service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody."); *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1998) ("The mere fact of incarceration

does not ipso facto render an interrogation custodial."); *United States v. Bruflodt*, Crim. No. 07-389-02 (JMR/FLN), 2008 WL 1882802, at *7 (D. Minn. Apr. 24, 2008) (same). The fact of incarceration must nevertheless be taken into account in resolving the ultimate inquiry – "'whether a reasonable [person] in the suspect's position would have understood [her]self to be in custody.'" *Chamberlain*, 163 F.3d at 502 (quoting *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988)).

When considering the impact of an inmate's incarceration on the custody determination, several circuits ask whether the circumstances involve a restriction on the inmate's freedom of action in connection with the interrogation that exceeds the normal restrictions associated with incarceration. *See Tawfeq Saleh v. Fleming*, 512 F.3d 548, 551 (9th Cir. 2008) ("We agree that . . . incarceration does not ipso facto render an interrogation custodial [and *Miranda* warnings] to the person in custody for an unrelated matter will only be triggered by some restriction on his freedom of action in connection with the interrogation itself.") (internal quotation marks and citation omitted); *United States v. Menzer*, 29 F.3d 1223, 1231–32 (7th Cir. 1994) (finding inmate "in custody" for purposes of *Miranda* when there is an additional imposition on the inmate's freedom of movement or a measure of compulsion over and beyond imprisonment); *Garcia v. Singletary*, 13 F.3d 1487, 1491 (11th Cir. 1994) (holding that *Miranda* "custody" occurs only when inmate's freedom is restricted beyond the norm in the setting in which it occurred). This inquiry is relevant to determining whether a

defendant is in custody for purposes of *Miranda*, but it is not a talismanic substitute for the overriding question whether, under the totality of the circumstances, the defendant was restrained as though under formal arrest. *See Czichray*, 378 F.3d at 828; *see also Chamberlain*, 163 F.3d at 502–04 (applying a totality of the circumstances test to determine whether an inmate was in custody for purposes of *Miranda*).

### B.    Interrogation

To trigger the protections of *Miranda*, an individual must also be subjected to "interrogation."  Interrogation refers to "questioning initiated by law enforcement officers."  *Miranda*, 384 U.S. at 444.  And it is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect[.]"  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

## II.    Defendant was Subjected to Custodial Interrogation Without *Miranda* Warnings Requiring Suppression of the Statements at Issue

Weighing all the evidence in the record, this Court concludes that Defendant was subjected to custodial interrogation when Lieutenant Dern questioned her about the incident and the reason she had the cord or rope. Because Lieutenant Dern failed to advise her of her constitutional rights to remain silent, to have an attorney present, and to have an attorney appointed for

her if she could not afford one before engaging in that questioning, her statements must be suppressed.

There does not appear to be any serious dispute that Lieutenant Dern's questions constituted interrogation.[5] "[E]xpress questioning" qualifies as interrogation for purpose of *Miranda*. *Innis*, 446 U.S. at 301. Lieutenant Dern asked Defendant three direct questions: (1) what happened; (2) what's going on; and (3) what was the rope for. These questions are not like routine booking questions that do not qualify as interrogation for purposes of *Miranda*. Rather, these questions were reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301. Defendant had just been handcuffed and a suspected weapon was pulled from her hands. Shortly thereafter she was escorted to a location within the prison where she would be held while the incident was investigated and where she could, if convicted of a violation of prison rules, be "serving a sentence" as part of the prison's standard disciplinary procedures. (*See* Tr. 17:25–18:2.) Asking an individual what happened and what the suspected weapon was for under these circumstances is express questioning reasonably likely to elicit an incriminating response and therefore satisfies the Supreme Court's definition of "interrogation."

---

[5] The gist of the Government's arguments in this case concern whether Defendant was "in custody" at the time she made the statements at issue. The Government does not argue that the circumstances here involved no express questioning or its functional equivalent.

Numerous factors also demonstrate that Defendant's interrogation was custodial. At the time she responded to Lieutenant Dern's questions, Defendant was handcuffed with her hands behind her back. This was plainly an imposition on her freedom of movement over and above the restrictions she typically experienced by her status as a prison inmate. Lieutenant Dern further restricted her freedom of movement by holding onto the back of her arm and using that physical contact to direct her movement through the prison corridors to the SHU. These heightened restrictions on Defendant's autonomy of movement in the prison, and the fact that Dern took these steps because Defendant was suspected of having been involved in a possible crime. lead this Court to believe that Defendant "was restrained as though [s]he were under formal arrest." *Czichray*, 378 F.3d at 827; *see also Griffin*, 922 F.2d at 1349 (noting that whether a person retained unrestrained freedom of movement when questioned is relevant to the question of custody).

Further, Defendant did not ask to speak to Lieutenant Dern about the incident or voluntarily acquiesce to a request to respond to questioning about it. Nor did she volunteer to walk with him toward the SHU. These factors also suggest that a reasonable person in her position would believe she was in custody when Lieutenant Dern questioned her. *Chamberlain*, 163 F.3d at 503 (escorting a prisoner to an interview room weighed in favor of finding that he was in custody); *Griffin*, 922 F.2d at 1349 (noting that whether a person initiated contact with authorities is relevant to the question of custody); *cf. Leviston v.*

*Black*, 843 F.2d 302, 304 (8th Cir. 1988) (concluding that the district court properly found that the prisoner initiated the police inquiry, meetings with the police arose out of the prisoner's desire to speak with police about a robbery, and the prisoner voluntarily went to the interview room on for both of the meetings with the police).

In addition, Lieutenant Dern never advised Defendant that she was free to leave or that she could ask Lieutenant Dern to leave; on the contrary, he explained that because she was involved in a fight, she had no choice but to go to the SHU. Lieutenant Dern also did not advise Defendant that she did not have to answer his questions or that her decision to respond was voluntary. And Lieutenant Dern never told her that she was not considered under arrest. All of these facts indicate that Defendant was in custody for purposes of *Miranda*. *See Chamberlain*, 163 F.3d at 504 (finding that failure to tell the defendant questioning was voluntary or that he was free to leave weighed in favor of a finding of custody, and noting that if defendant had refused to participate in the interview or left the room without permission, he would have violated prison rules); *Griffin*, 922 F.2d at 1349 (noting that informing the suspect at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under can mitigate custodial atmosphere).

The fact that Defendant was being taken to the SHU also indicates that Defendant was in custody. And at the conclusion of Lieutenant Dern's

questioning, he placed Defendant in the administrative segregation portion of the SHU where she was to be held, and she could potentially have been transferred to disciplinary segregation if she were found to have violated the prison's disciplinary rules. Thus, her "transfer to a more confined situation was clearly the result of the investigation," further indicating that she was "in custody" when she was questioned. *Chamberlain*, 163 F.3d at 504.

The Government contends that the fact that Defendant was handcuffed should "not weigh heavily in the analysis" because it was standard procedure at FCI-Waseca to restrain any inmate who has been involved in a fight or an assault. (Doc. No. 46, Gov't's Resp. to Def.'s Pretrial Mot. to Suppress Statements ("Gov't's Br.") 10.) The Government cites *United States v. Conley*, 779 F.2d 970, 973–74 (4th Cir. 1985), for support, but in *Conley*, the facility where the defendant was confined was a "maximum security facility," and it was standard procedure to restrain *any inmate* who was being transported *anywhere within the facility*. 779 F.2d at 974. Thus, the Fourth Circuit did not consider the use of restraints in *Conley* to be a strong marker of custody under the circumstances because the defendant was not being subjected to restrictions on his freedom of movement that were any greater than what he normally would have experienced if he were moving within the prison for any reason. *See id.* at 973–94 (discussing the use of the added-imposition test as a means of determining whether a prisoner is in custody for purposes of *Miranda*). Unlike in *Conley*, there is no evidence in the record here that handcuffing prisoners was a

"standard procedure" used any time inmates were moved anywhere within FCI-Waseca. Here, Lieutenant Dern merely testified that when an inmate is suspected of having violated prison rules by getting into a fight, it is standard procedure at FCI-Waseca to restrain that prisoner. Even though he was carrying out FCI-Waseca's applicable standard procedure, Lieutenant Dern's restraint of Defendant, along with all the other circumstances, equates to placing Defendant under formal arrest.

The Government also argues that Defendant was not subjected to custodial interrogation because Lieutenant Dern was not armed, the questioning did not last very long, the questioning happened in an average-sized, well lit room, and Dern did not use a sharp tone or raise his voice. (Gov't Br. 9.) Thus, the Government suggests that the circumstances here are comparable to or less custodial than those discussed in the Supreme Court's opinion in *Howes v. Fields*, 132 S. Ct. 1181 (2012). (*See* Gov't Br. at 9.) But the Government overlooks several important factors that led to the conclusion in *Howes* that the habeas petition was properly denied. First, the petitioner in *Howes* was told "at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." 132 S. Ct. at 1193. A reasonable person in the position of the habeas petitioner in *Howes*, having been told that he did not have to answer any questions and that the he could go back to the normal conditions of confinement whenever he wanted, would not have understood himself to be in custody. Nothing remotely close to such a warning

14

occurred here.  Further, unlike Defendant, who was handcuffed behind her back and ushered through the prison hallway by the officer's grip on her arm, the petitioner in *Howes* was never restrained and was "not uncomfortable."  *Id.*  This Court would not characterize Defendant's escort similarly.  Moreover, the Court in *Howes* noted that the habeas petitioner's cooperation was not coerced by the fact that ending the interview would have resulted in being sent back to his "usual environment" rather than a more restrictive one.  *Id.* at 1193–94.  But the same was not true for Defendant; as soon as she responded to Lieutenant Dern's questions, she was placed in the SHU where she would be segregated from the rest of the prison population and potentially subject to greater restrictions than in her usual environment.  In short, the factors leading the Court to conclude there was no coercive atmosphere in *Howes* are absent from the record in this case.

The circumstances here also involve the type of coercive pressure *Miranda* was designed to prevent.  An ordinary prisoner thrust into Defendant's position could easily feel coerced into answering questions.  The Supreme Court's rationale for adopting the rule it did in *Miranda* depended in part on the notion that a person subjected to a station-house interrogation has been transported from her normal every day surroundings to a location where coercive pressure may be applied.  *See Miranda*, 384 U.S. at 455 (discussing the investigative technique of maneuvering a suspect into a position to obtain a confession and trading on his insecurity about himself and his surroundings).  A person in Defendant's position may feel coerced into cooperating with a correctional

15

officer's questions in the hopes of a prompt release from being segregated from the general population. At the point that Defendant made the statements to Lieutenant Dern, a reasonable prisoner in Defendant's position would have understood that Dern controlled what would happen to her. She had no way of knowing whether Lieutenant Dern would continue questioning her or how long she was going to be held in the SHU. In other words, a reasonable person in Defendant's position would have felt the kind of coercive pressure *Miranda* was designed to protect against because there is no evidence in the record suggesting that Defendant could have terminated the interview and left.

Consistent with the foregoing, this Court concludes that Defendant's statements were made in violation of her Fifth Amendment rights, and as a result, those statements must be suppressed and Defendant's motion be granted.

## III. This Case Does Not Involve General On-the-Scene Questioning

The Government also argues that Defendant's statements can properly be admitted against her even though they were not preceded by *Miranda* warnings because they were made in response to general on-the-scene questioning. (Gov't's Br. 3–7.) Noting that Lieutenant Dern testified that he was uncertain whether the June 10, 2011 incident was gang-related or whether anyone else had been injured, and that he just wanted to make sure he understood whether there was an ongoing threat to institutional safety, the Government contends that Lieutenant Dern's questions amounted to the kind of general on-the-scene questioning to which *Miranda* does not apply. (*Id.*)

16

In *Miranda* the Supreme Court indicated that its decision left untouched the propriety of police officers engaging in traditional investigative methods that did not involve custodial interrogation. The full discussion of this issue is as follows:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime. *See Escobedo v. State of Illinois*, 378 U.S. 478, 492, 84 S. Ct. 1758, 1765 [(1964)]. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Miranda*, 384 U.S. at 477–78; *see also id.* at 478 n.46 (discussing the distinction between the "unfavourable" situation to the suspect in the modern practice of custodial interrogation and the general investigative on-the-scene questioning by reference to a Scottish decision describing former police practices of questioning a suspect in his house or place of business and in the presence of a relation or friend). *Miranda* does not apply to these on-the-scene investigative efforts because the individuals being questioned are not in custody at all and there is no coercive atmosphere. *See id.* at 477 (referring to investigation including questioning of "persons not under restraint" and "questioning of citizens" at the scene of an incident or other questioning of citizens "in the fact-finding process").

As discussed above, the atmosphere in which Defendant was questioned was in fact, a coercive one, and the circumstances of this case simply do not

involve general on-the-scene questioning of the type the Supreme Court discussed in *Miranda*. This case involves a coercive pressure on a restrained individual's will that is fundamentally different than the non-coercive atmosphere when an officer meets with citizens on the street or in their homes to ask questions as part of the fact-gathering process of investigation. An officer asking "What happened," "What is going on," and "What was the rope for" to a handcuffed inmate he is taking to a segregated housing unit within the prison as part of the institution's disciplinary procedures in response to a prison fight is fundamentally different from a police officer who responds to a call and then asks unrestrained citizens what they know about a suspected crime.

Nor did Lieutenant Dern ask his questions to Defendant as a "spontaneous reaction" to the discovery of something surprising as the Government contends. (*See* Gov't Br. 11 (citing *Cervantes v. Walker*, 589 F.2d 424, 429 (9th Cir. 1978) (concluding that an officer's questions to an inmate about the contents of a box believed to contain marijuana was on-the-scene questioning in part because it was a "spontaneous reaction" to the discovery of a substance suspected to be drugs).) In fact, there was nothing spontaneous about Dern's questions at all. Actions had been taken at the C-Unit to control the scene, such as placing the prisoners back in their cells and going forward with the count. The suspected participants in the fight had been removed from the area, and several minutes had passed since Lieutenant Dern arrived on the scene and ordered Defendant to be taken out into a foyer area before she was escorted to the SHU. Asking

18

questions about what transpired after all of this had taken place, even if the prison officials acted quite efficiently, does not amount to spontaneity. This might be a different case if, upon reaching the top of the stairs, entering the C-Unit, and seeing a crowd of inmates gathered near an injured prisoner and another inmate holding a cord between her hands, Lieutenant Dern had excitedly blurted out "What happened? What's going on? What is that rope for?" and Defendant made her statements then. But that is not what happened here. What did happen is that Defendant was subjected to an added imposition on her freedom than she normally experiences as a result of her imprisonment, and she was then asked direct questions by a government official in a coercive atmosphere.

In support of its on-the-scene-questioning argument, the Government primarily relies on three cases that arose in the prison context: *Wilson v. Cain*, 641 F.3d 96 (5th Cir. 2011); *United States v. Scalf*, 725 F.2d 1272 (10th Cir. 1984); and *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978). But none of these cases requires a conclusion that in this case there was only general on-the-scene questioning or that Defendant was not subjected to custodial interrogation.

First, the Fifth Circuit's decision in *Wilson* is of particularly limited value in reaching these conclusions because the issue it addressed was cabined by the standard of review for a habeas petition under 28 U.S.C. § 2254 ("AEDPA"), and here this Court is addressing the issue whether Defendant is entitled to have these statements suppressed under controlling Supreme Court and Eighth Circuit precedent. *See Wilson*, 641 F.3d at 102 ("The question before this court is

whether Supreme Court case law delineating the circumstances when a prison inmate is under custodial interrogation for purposes of *Miranda* establishes Wilson's right to *Miranda* warnings with sufficient clarity so that the Louisiana court was objectively unreasonable in concluding otherwise.").  There is no clear Supreme Court precedent establishing when prisoner questioning by prison officials shortly after an altercation crosses the line between on-the-scene fact gathering and custodial interrogation.  Taking into account the deference that the federal courts must show to state court adjudication under the AEDPA, the Fifth Circuit in *Wilson* concluded that it was not objectively unreasonable for the Louisiana State court to have decided that the circumstances did not amount to custodial interrogation for purposes of *Miranda*.  But that does not mean that the Louisiana State court was correct; it just means that the Fifth Circuit found no basis to overturn that court's decision in light of clearly established law as determined by the Supreme Court.  For example, referring to the physical circumstances surrounding Wilson's questioning (he was handcuffed and questioned in an office from which he was not free to leave), the Fifth Circuit said that these physical circumstances "while as a general matter supportive of Wilson's right to *Miranda* warnings, nonetheless d[id] not present a situation where it was unreasonable for the state court to have found that *Miranda* warnings were not necessary."  *Wilson*, 641 F.3d at 104.  Here we must decide whether or not there was a custodial interrogation, not whether the Supreme Court has clearly drawn the line for the circumstances involved here.  In doing

20

so, we come to the conclusion, based on the particular facts of this case, that the *Miranda* warnings were required.

Second, the circumstances in *Scalf* led the Tenth Circuit to conclude that the defendant "was not deprived of his freedom nor was he questioned in a coercive environment" where the defendant was inside his cell, his normal prison environment, at the time a corrections officer asked him about the location of two handmade knives the officer suspected he had used in an assault. 725 F.2d at 1276. Thus, the defendant in *Scalf* was not in custody when the prison official asked the question. And last, in *Cervantes*, the defendant was also not in custody when he was asked about the contents of a box containing marijuana; he was *in the prison library*, a change in his surroundings that did not result in any added imposition on his freedom of movement when compared with his normal prison environment. *Cervantes*, 589 F.2d at 429; *cf. Garcia v. Singletary*, 13 F.3d 1487, 1492 (11th Cir. 1994) (concluding that a prison official's question to an inmate about why the inmate started a fire was on-the-scene questioning and that the inmate was not in custody when official removed the inmate from his cell while putting out the fire; removing the inmate from the cell actually "provided him with greater freedom of movement and significantly reduced those preexisting restrictions").

The Government also appears to be arguing that this case involved on-the-scene questioning because Lieutenant Dern's subjective purpose for questioning Defendant was to discover whether there was some ongoing issue within the

prison.  (*See* Gov't's Br. 7.)  But the test for determining whether a person is in custody is an objective one, asking whether a reasonable person would understand herself to be in custody, not whether the officer's subjective intent in asking questions was investigatory.  *See United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) ("Th[e] determination [of custody] is based on the objective circumstances, not on subjective views of the participants."); *United States v. LeBrun*, 363 F.3d 715, 721 (8th Cir. 2004) ("In answering th[e] question [whether an interrogation is custodial], we look at the totality of the circumstances while keeping in mind that the determination is based on 'the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'") (quoting *Stansbury v. California*, 511 U.S. 318, 322–23 (1994)).  And to the extent the Government means to suggest that Lieutenant Dern had no idea what Defendant's role in the incident may have been, such an inference is unsupported by the record.  After seeing Defendant standing in a defensive position with a piece of cord in her hands and another inmate in the immediate vicinity with an injury around her neck, Lieutenant Dern and another officer responded by removing the cord from Defendant's hands, and immediately restraining both her the other inmate involved in the altercation.  That reaction suggests that the officers had concluded there was a fight and that Defendant had used the rope as a weapon

to hurt the other inmate.  To suggest that Lieutenant Dern simply had no idea what was going on is not credible.[6]

This does not mean that once a prisoner is suspected of having committed a crime, any questioning by prison officials becomes custodial.  Nor does it mean that Lieutenant Dern could not or should not have done something further to discover what the scope of the disagreement was that led to the incident in the C-Unit or if there was some ongoing safety issue he did not yet know about.  But the ever-present concern for institutional and prisoner safety does not transform custodial interrogation within a prison into general on-the-scene questioning as the Government appears to suggest.  The on-the-scene-questioning cases that discuss the need for prison safety stop short of announcing such a rule.  The Tenth Circuit in *Scalf*, for example, properly applied the on-the-scene questioning analysis because the defendant was not in custody and the officer's concern for prison safety was not general but concrete, i.e., somewhere in the prison there

---

[6]    In fact, the nature of Lieutenant Dern's last question to Defendant—"what was the rope for?"—suggests that his subjective intent was actually investigatory and that he intended to inculpate Defendant further in the suspected assault.   He was engaged in investigation of Defendant's involvement of the incident at that point, a fact which he admitted would have disqualified him from sitting as a disciplinary hearing officer had disciplinary charges been brought against Defendant for the incident.  Lieutenant Dern testified that one of his jobs in the prison was to act as a disciplinary hearing officer.  (Tr. 35:11–17.)  He described his duties in that capacity as hearing "[n]on-criminal and quasi-criminal cases." (Tr. 35:15–17.)  When he is involved in a case as a disciplinary hearing officer, he would not be involved in any of the investigation.  (Tr. 35:18–22.)  But he stated that had there been a disciplinary hearing relating to the incident in this case, he could not have heard it in his role as a hearing officer because he was involved in its investigation.  (*See* Tr. 35:19–21.)

was a missing weapon (two handcrafted knives) that had been used in an assault. 725 F.2d at 1276 (finding that the officer's non-custodial query about missing weapons used in a prison assault was part of an on-the-scene inquiry conducted in conjunction with his security responsibilities). This Court has not found, and the Government does not cite to, any case holding that there is an exception to *Miranda* based on the general need to maintain prison safety.[7] And the reason no court has adopted such a rule is that it would mean that *Miranda* no longer applies in prison. Any time government officers question an inmate about an incident that occurred within a prison's walls, those officials could reasonably assert that they wanted to know if there was any larger safety issue they should know about.

For all these reasons, this Court concludes that this case did not involve general on-the-scene questioning, and Defendant's statements must be suppressed.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant's Pretrial Motion to Suppress Statements (Doc. No. 17), be **GRANTED**.

---

[7]     Nor does the Government argue that Defendant's statements are admissible in this case under the "public safety" exception to *Miranda* established by *New York v. Quarles*, 467 U.S. 649 (1984).

Dated:  December 19, 2012

 _s/ Jeffrey J. Keyes_
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 2, 2013**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen** days after service thereof.  All briefs filed
under this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.

    Unless the parties stipulate that the District Court is not required by 28
U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections
made to this Report and Recommendation, the party making the objections shall
timely order and file a complete transcript of the hearing within ten days of receipt
of the Report.